Calhoun for the use of Fitzimmons and another *against* The Insurance Company of Pennsylvania.

COVENANT on a policy on goods on board the brig *John,* Barker master, from *Charleston South Carolina* to *Cadiz,* 15000 dolls. at 15 per cent. The foot of the policy contained the following memorandum: " This insurance is declared to be " made on sugars not discharged from on board the above ves- " sel at *Charleston,* where she brought them from *Havanna.* " Warranted by assured to be *American* property, *to be proved, " if required, in this city, and not elsewhere.*"

Upon the trial of the cause before Smith J. at *Nisi Prius* in *July* 1807, the material facts in evidence were these. On the 8th *June* 1800, the *John* sailed upon the voyage insured from *Charleston,* where at that time the blockade of *Cadiz* was not known. On the 16th *July* as the vessel was steering for *Cadiz,* and at no great distance from that port, the captain was brought to by the *Hector,* one of the squadron blockading *Cadiz* under Admiral *Bickerton,* was warned not to enter *Cadiz* on account of the blockade, and was taken on board the *Hector* with his papers. On the same day he was carried on board the admiral's ship, but was afterwards returned to his own vessel, from which the mate and four hands were taken out, and an officer and eight men put on board of her with orders to stay by the fleet. On the 26th *July* the brig's papers were indorsed " warned not to " enter *Cadiz* or *St. Lucar* as they are blockaded, *but has per-* " *mission to go to any other port. Swiftsure, July* 26th 1800. " *B. Hallowell,* Captain of the *Swiftsure,* one of the ships of the " blockading squadron;" but there was no evidence of these pa- pers having been at any time in Captain *Barker's* possession after the 16th July, or that he saw them after that date until

*If a policy underwritten in Philadelphia contains a warranty of American property " to be proved, if required in this city and not elsewhere," the assured is entitled to vindicate the truth of his warranty not only against a foreign condemnation as enemies' property, but against a condemnation for any act or omission of his agents during the voyage, by which the neutrality is alleged to have been forfeited.*

*A vessel sails from Charleston for Cadiz without any notice of its being in a state of*

blockade, and within a short distance of the port is brought to by the blockading squadron and warned not to enter on account of the blockade; the mate and four hands are taken out of her, and an officer and eight men put on board with orders to stay by the fleet. Ten days afterwards the captain is taken out of her and carried to the Admiral of the squadron who says to him, " We have thoughts of setting you at liberty, and in case " we do, what port will you proceed for?" The captain replies, " In case I receive no " new instructions I shall follow my old ones." " That I suppose will be for Cadiz?" " Certainly, unless I have new orders." This is not an *attempt* to enter, and therefore no breach of blockade. *Quære.* Whether any declaration of an *intention* to enter, amounts to an *attempt?*

they were exhibited in the Admiralty at *Gibraltar.* The mate however declared on his examination in that court, that after they had been in possession of the *British* about ten days, the papers and command of the vessel were offered to Captain *Barker*, which he refused, because his vessel had been taken and his hands unjustifiably removed. On the 27th of *July*, until which day the Captain had been detained on board the brig, he was again taken on board the Admiral, who addressed him thus; " We have thoughts of setting you at liberty; and in case " we do, what course will you steer?" *or* " what port will you " proceed for?" Captain *Barker* replied " In case I receive no " new orders," *or* " new instructions, I shall follow my old " ones." " I suppose that will be for *Cadiz*," said the Admiral; to which the Captain answered " Certainly, unless I have new " orders." Sir *Richard Bickerton* then said " That is sufficient, " I shall send you to *Gibraltar*, for adjudication." He was accordingly sent to *Gibraltar*, where the vessel and cargo were libelled, and on the 26th *August* 1800 the decree was pronounced in the following terms: " The Judge having heard the " said claimant together with the sundry examinations taken in " preparatory in the cause, and the papers and documents " found on board said brig at the time of the capture, and de- " livered in to the register upon oath, and having further heard " the parties &c. rejected the claim, and declared the brig to " have been cleared out for *Cadiz*, a port actually blockaded by " the arms of our sovereign lord the king; and that the mas- " ter of the said brig *persisted in his intention* of entering that " port, after warning from the blockading force not to do so, " in a *direct breach and violation of the blockade* thereby noti- " fied; and pronounced the said brig and cargo *by virtue there-* " *of or otherwise* subject and liable to confiscation, and con- " demned the same as *good and lawful prize* to our sovereign " lord the king."

The interest of the plaintiffs who were *American* citizens, and a regular abandonment, were proved or admitted; and the jury found a verdict for a total loss, subject to the opinion of the court upon the three following points;

1. Whether the decree of the Court of Vice Admiralty of *Gibraltar* was or was not conclusive evidence of the facts set forth in it. And if conclusive, whether it discharged the underwriters.

2. Whether the conduct of the captain in the bay of *Cadiz* in relation to the blockade, did or did not amount to a breach of the warranty in the policy.

1808.

CALHOUN
*v.*
Ins. Co.
Penn.

3. Whether the captain's conduct amounted to barratry; with liberty to move for a new trial on the ground of the verdict being against law and evidence.

A motion for a new trial was accordingly made; and this question and the points above stated were argued by *Dallas* and *Levy* for the plaintiffs, and by *Rawle* and *Lewis* for the defendants.

1. On the *first* point the plaintiff's counsel conceded the principle that the decree of an Admiralty Court binds the property for ever, as in *Hughes* v. *Cornelius;* (a) and that a condemnation as prize *generally*, *Saloucci* v. *Woodmass* (b) or as prize, assigning for cause such an act or omission as is against the law of nations or a treaty between the nations of the captor and owner, *Garrels* v. *Kensington*, (c) or as enemies' property *generally*, or enemies' property for the want of neutral documents, *Geyer* v. *Aguilar*, (d) is conclusive upon the warranty of neutrality. But they insisted that it is not conclusive upon the warranty where the sentence is ambiguous, *Bernardi* v. *Motteux*, (e) or when it is founded upon an ordinance against the law of nations, *Bird* v. *Appleton*, (f) or where the grounds of the sentence contradict the conclusion, the condemnation being as prize, *Pollard* v. *Bell*, (g) or contradict a treaty between the nations of the captor and owner. *Price* v. *Bell*. (h) In the present case the grounds of the sentence are facts which even under the law of nations are not a breach of blockade, and which certainly do not constitute that offence under the treaty between the *United States* and *Great Britain*, as will be shewn under the second point.

But whatever may be the conclusiveness of the sentence in a common case, the special clause in this policy prevents that effect altogether. It was introduced solely with that view, and it has been construed to have that operation by Judge *Wash-*

(a) 2 *Show.* 232.
(b) *Park.* 362.
(c) 8 *D. & E.* 230
(d) 7 *D & E.* 681.

(e) *Doug.* 575.
(f) 8 *D. & E.* 562.
(g) 8 *D. & E.* 434.
(h) 1 *East* 668.

1808.

CALHOUN
v.
Ins. Co.
Penn.

*ington* in *Calbraith* v. *Gracie* decided at *April* sessions 1805. (*a*) It may be argued that the design of the clause was merely to allow a proof of *property*, strictly speaking, in opposition to the sentence; and that a condemnation for unneutral conduct, or for such acts as amount to a forfeiture of neutrality, is left to its legal operation. But considering what the sentences of Vice Admiralty Courts had been, such a construction supposes the assured to protect himself against one in a hundred of the probable acts of injustice of those courts, and to leave himself exposed to the the other ninety nine. The argument moreover results in this dilemma. If the sentence does not decide the question of property, it does not forfeit the warranty; if it decides the question of property, the clause applies.

2. The facts being let in, they negative a breach of the warranty. They do not shew even an *intention* to break the block-

(*a*) CALBRAITH ⎱ Upon the opening of this cause on the defendant's
 v.      ⎰ side, the plaintiff, the assured, objected to the reading
GRACIE.      of the proceedings in the Court of Vice Admiralty in *New Providence*, in consequence of a clause in the policy. The property insured was warranted *American* property, with this proviso, *That if the same shall be called in question, it shall be sufficient on the part of the assured to prove in any Court of the United States that the property is American.*

After argument upon the point, the opinion of the Court was delivered by WASHINGTON J.

This is a new clause which has been introduced into policies of insurance by some underwriters within a few years past. The sooner it receives a construction the better. To understand it we must pursue the rule adopted as to the exposition of statutes. We must find out what was the mischief it was intended to remedy, and then the extent of the remedy. The mischief was that the sentence of a Foreign Court of Admiralty condemning a vessel as enemies' property or as lawful prize, was and is considered universally in *England*, and has been so decided in some of the states, as conclusive proof of that fact against the assured so as to forfeit his warranty of neutrality; and this too though he should be able to prove the falsity of the conclusion. The remedy was to meet and correct this, which often in former wars, and still more in those which have lately happened, was a crying evil. We have all heard of the conduct of the *West India* Courts of Vice Admiralty, and the shameful abandonment of all correct principles which has disgraced their decisions. The assured did not chuse that their property when really neutral, and which they could prove to be so, should be declared otherwise in consequence of a sentence of those Courts. But they never meant to go further, and it would be improper to have done so. *They are, notwithstanding the sentence, to be at liberty to vindicate the truth of their warranty.* But the underwriter may combat that fact by reading the proceedings of the Foreign Court of Admiralty as evidence, but not as conclusive evidence. Indeed they may often be essentially necessary to prove the loss.

ade; for the language of the Captain, upon which alone the captors and the Court of Vice Admiralty proceeded, though insidiously extorted, to furnish a ground of detention, and therefore according to the case of the *Mercurius*, (a) entitled to peculiar indulgence, does not when construed with the utmost severity amount to such an intention. But an intention is not a breach of blockade by the law of nations, or the treaty.

By the law of nations there must be an *attempt* to enter, or there is no offence, *Vattel B.* iii. *ch.* vii. *sec.* 117; and the greatest extent to which constructive breaches of blockade have been carried, is in those cases which treat the *sailing* with intention to break the blockade as an overt act, an *attempt.* (b) In this case however both the ingredients of this kind of attempt are wanting. In the first place *notice*, which is implied in the intention, and which the Captain never received until he was detained by the squadron; and in the next place the *act of sailing*, which never was in his power after the notice was given. The only case in which there is an intimation that an *intention* may break a blockade, is that of the *Henrick* and *Maria* (c) in which the vessel was restored. There is at the same time in that decision, something very equivocal in the words of Sir *William Scott*; for in one place he speaks of *an adherence to a first intention* as subjecting a ship to the penalty; and in another as though that would attach only where the Captain's *conduct* amounts to an *obstinate perseverance.*

Under the treaty the case is still plainer. The 18th article recites that " whereas it frequently happens that vessels sail for " a port or place belonging to an enemy without knowing that " the same is either besieged, blockaded, or invested, it is " agreed that every vessel so circumstanced may be *turned* " *away* from such port or place, but she shall not be detained, " nor her cargo, if not contraband, confiscated, unless after no- " tice *she shall again attempt to enter.*" (d) So far as the treaty interferes with the general law, the latter must yield. The plain unequivocal language of the former requires that there must be an *actual turning away*, and then an *attempt*, before there is a breach of blockade; and such has been the decision in *New.*

(a) 1 *Rob.* 70.　　　　　　　　(c) 1 *Rob.* 123.
(b) *Columbia*, 1 *Rob.* 150.　　(d) 2. *U. S. Laws.* 484.

*York* in the very case of the *Columbia, Liotard* v. *Graves*, (*a*) and in *Vos* and *Graves* v. *United Ins. Co.* (*b*) The indorsement on the papers of 26th July 1800 shews of itself that there had been so far no breach of blockade, and on that day the vessel was sent to *Gibraltar*, the Captain never having had his papers after his detention, and never being told that he was at liberty to depart and go elsewhere. The mate it is true says the command was offered to the Captain, and that he refused it in consequence of the delay and loss of hands. This was probably hearsay, as the mate was one of those who were taken out; but the facts were a justification to the Captain; the squadron should have turned him away at once.

3. If however there was a breach of blockade by what is called the obstinate adherence of the Captain to the intention of entering *Cadiz*, it was barratry. Judge *Buller* was of opinion in *Saloucci* v. *Johnson* (*c*) that if a resistance to search was a forfeiture of neutrality, it would be barratrous; and there is no doubt that the neutrality of a vessel and cargo is forfeited by a breach of blockade. It is a breach of trust to the injury of the owners, and it is necessarily *ex maleficio* or *malo animo*, because it is illegal and certainly injurious to the owners. That it is not for the Captain's benefit is immaterial; this is a mere circumstance to shew fraud in an ambiguous case; but is not wanting in a case where the law will imply fraud from the illegality and the tendency of the act. *Earl* v. *Rowcroft.* (*d*) The breach of blockade is stronger than sailing out of port without paying duties, *Knight* v. *Cambridge*, (*e*) or than smuggling, *Havelock* v. *Hancill*; (*f*) for in each case there may be some benefit to the owner; whereas here the act is fatal to his interests, and comes up to all the cases upon barratry. *Vallejo* v. *Wheeler*, (*g*) *Robinson* v. *Ewer*, (*h*) *Hood's Executors* v. *Nesbit*, (*i*) *Moss* v. *Byrom.* (*k*)

For the defendants it was argued on the *first* point that the admissions of the plaintiff's counsel put the question at rest in the present cause; for the principle which they recognise, in

---

(*a*) 1 *N. Y. Cases in Error* 7.  
(*b*) 3 *Caines* 226.  
(*c*) *Park.* 365.  
(*d*) 8 *East* 126.  
(*e*) 8 *Mod.* 230. *Cowp.* 153.  
(*f*) 3 *D. & E.* 277.  
(*g*) *Cowp.* 143.  
(*h*) 1 *D. & E.* 127.  
(*i*) 2 *Dall.* 137.  
(*k*) 6 *D. & E.* 379.

adopting certain of the *English* authorities is, that the decree
of a Court of Admiralty is conclusive as to all the matters it
directly decides; those authorities proceeding upon no other
principle. There is as between the insurer and insured an-
other consideration, always as material as the conclusiveness of
the sentence, that is, whether the matters decided do or do not
falsify the warranty; and hence in *Bernardi* v. *Motteux*, *Bird*
v. *Appleton*, *Pollard* v. *Bell* and *Price* v. *Bell*, there was a reco-
very upon the policy, not because the sentence was not conclu-
sive as to what it directly decided, but because there was no-
thing directly decided by the sentence that falsified the warranty.
But there is not a case to be found in which an *English* court
has ever questioned the decision or conclusion of a Court of
Admiralty on any point either of law or fact in a case within its
jurisdiction. *Lothian* v. *Henderson*. (*a*) It is a doctrine of the
common law and has been repeatedly acknowledged in *Penn-
sylvania*, that no court can in a collateral way review the pro-
ceedings of a tribunal which had jurisdiction of the subject mat-
ter; and that where a matter comes to be tried in a collateral
way, the decree of *any* court of competent jurisdiction is con-
clusive evidence of such matter while it remains unreversed.
*Penhallow* v. *Doane* (*b*), *Jones* v. *Bow* (*c*), *Bull N. P.* 244. *Al-
len* v. *Dundas* (*d*), *Rapelje* v. *Emery*. (*e*) That at this day the
law of *England* deems the sentence of an Admiralty Court con-
clusive as to every point it directly decides, cannot be question-
ed; not one of the twelve judges in *Lothian* v. *Henderson* inti-
mated a doubt of it, although one or two of them expressed a
regret that in its application to *French* decrees the principle was
productive of hardship. Such also is the law of this state since
the case of *Dempsey* v. *The Insurance Co. of Pennsylvania* (*f*)
in which the point was decided by this Court, and which is still

1808.

CALHOUN
*v.*
Ins. Co.
Penn.

(*a*) 3 *Bos. & Pull.* 516.          (*d*) 3 *D & E.* 129.
(*b*) 3 *Dall.* 185. 1 *Dall.* 220.     (*e*) 2 *Dall.* 231.
(*c*) *Carth.* 225.

(*f*) Since the argument in this cause, the case of *Dempsey assignee of
Brown* v. *The Insurance Company of Pennsylvania* has been decided in the
High Court of Errors and Appeals.

It was an action of covenant on a policy on goods on board the brig *Betsy*
at and from *Philadelphia* to *Bordeaux* and back, *warranted American property*,
and that the vessel was an American bottom. The brig was captured by a
British ship of war and carried into the island of *Bermudas*, where vessel and

the law, although a writ of error is pending before the court of last resort. The idea that the sentence is not conclusive if it decides in opposition to the law of nations, is altogether new; if it were just, the sentence would in no case be conclusive, for the instant you examine into the propriety of it, you try the matter over again, and the conclusiveness of the decree vanishes. Then how far does the present decree go, what does it decide? Most clearly it decides that the Captain committed a breach of blockade, which it is conceded is a breach of neutrality, and therefore a forfeiture of the warranty.

The special clause was not designed for the case that has happened. The meaning of it is that the *property* only is to be proved here; for independent of the warranty the insured was bound to conduct himself as a neutral; and the clause must therefore have been introduced in consequence of the warranty and merely to prevent its being falsified by an Admiralty sen-

cargo were acquitted; but upon an appeal this sentence so far as respected the cargo was reversed, and the same condemned as belonging to the enemies of the crown of *Great Britain*, and by virtue thereof *or otherwise* good and lawful prize.

The cause was tried in Bank at *December* term 1804, when the record of the Vice Admiralty at *Bermudas*, and the final sentence of the Lords Commissioners of Appeal, were given in evidence. The plaintiff then offered to prove that the cargo at the time of the capture and condemnation belonged soley to *Brown*, who was a native citizen of the *United States* residing there. This evidence was objected to by the defendants, because the proceedings in the Court of Vice Admiralty and the final sentence of the commissioners were *conclusive* evidence that the cargo was at the time of the capture the property of enemies to the crown of *Great Britain*, and not American property. Of this opinion was the Court, who overruled the evidence; and the jury found for the defendants. A bill of exceptions was tendered and allowed, and the record carried by Writ of Error to the High Court of Errors and Appeals.

In that Court the case was twice argued, first at *July* term 1807, and again at *July* term 1808. Upon the first argument two questions were made: 1. Whether the sentence of the Lords Commissioners of Appeal decided directly such facts as falsified the warranty; and 2. If it did, whether it was conclusive evidence of those facts between the parties to this suit. Upon the first argument the Court declared their opinion that the facts decided by the sentence did falsify the warranty; and the second argument was therefore confined to the general question " Whether the sentence of a foreign Court of Admiralty, condemning property as prize, is conclusive not only as to its *direct effects*, but also as to the *facts directly decided by it.*" Of the affirmative opinion were *Presidents* RUSH, ROBERTS, HAMILTON, YOUNG and WILSON; *President* COOPER contra. Accordingly the Judgment of this Court was AFFIRMED.

tence upon the very point of property. In *Calbraith* v. *Gracie* the condemnation was as enemies' property.

2. But if the facts are let in, they shew a breach of the warranty. The treaty between the *United States* and *Great Britain* is in the matter of blockade in affirmance of the law of nations; it introduces no new principle. An *attempt* is necessary in all cases; but the question is, what is an *attempt?* Under the treaty there must in certain cases be a *turning away;* but what is that? That there should be a physical turning away by the blockading squadron is absurd; the Captain should turn himself away. The meaning of the phrase must be ascertained by its object. The treaty applies only to cases in which there was no notice; and its first provision is therefore for notice, which is signified by the terms *turning away*, or what was practised by the squadron at *Cadiz, warning off.* The Captain was then turned away on the 16th *July* after he had once attempted to enter, being as is said ignorant of the blockade. But what shall amount to *again attempting* to enter? It cannot be that it means only an actual sailing toward the blockaded port; for if the Captain hovered about the port without taking a direction to one which he might lawfully enter, it would be a clear *attempt*. This attempt would consist in his not going away according to his duty; and remaining on the spot would be the overt act. If the possession of the vessel is offered to him that he may go elsewhere, and he refuses to take it but upon the threat of going to the prohibited port, here is an attempt of the same kind; and his refusal to go away with the vessel is the overt act. *Case of the Apollo.* (*a*) That Captain Barker refused his vessel and papers with the liberty to go to any but the blockaded ports is sworn by the mate; and that something of this kind passed may be inferred from the questions put to him by the Admiral, which cannot be accounted for but upon the supposition of some previous offer, refusal, and threat. On the 27th of *July* however, eleven days after notice, he makes his deliberate declaration that if he is dismissed he will go to *Cadiz;* for such is the obvious meaning of his words. The old orders which he threatened to follow if he did not get new, were clearly those of his owners, as they led to *Cadiz,* and those of the Admiral another way; and the impossibility of getting new ones at that time from his owners,

1808.

CALHOUN
*v.*
Ins. Co.
Penn.

(*a*) 5 *Rob.* 256.

is a proof of the inveterate obstinacy with which he persevered in the prohibited track. This conversation and the refusal were a clear attempt; and there was therefore a breach of blockade under the treaty.

3. The Captain's conduct was not barratry; it was grossly improper, but for this impropriety the owners must answer, as they are bound to provide a person of competent skill. *Law* v. *Hollingsworth.* (*a*) To constitute barratry there must be some fraud or knavery or other criminal act practised against the interest of the owners. *Hood* v. *Nesbit.* (*b*) In this case the Captain was to derive no benefit; and this is a powerful circumstance to negative fraud. If a breach of blockade were designed for the benefit of the owners, surely it would not be barratry; *Case of the Adonis;* and it is not possible that here it could be designed for any thing else. If fraud is to be presumed from the illegality of the act, it is barratry to pursue the exclusive interest of the owners through such an act; this cannot be law. There must be something criminal in the Captain's conduct, or there must be the *malus animus* directed against the owner; in this case there was neither. In *Moss* v. *Byrom* the Captain committed piracy; and in *Earle* v. *Rowcroft* he sold arms and ammunition to the enemies of his country.

TILGHMAN C. J. This cause arises on a policy of insurance on the cargo of the brig *John, Richard Barker* master, at and from *Charleston, South Carolina,* to *Cadiz,* for 15,000 dollars, premium 15 per cent. At the foot of the policy is the following agreement: " This insurance is declared to be made on sugars, " not discharged from on board the above vessel at *Charleston,* " where she brought them from *Havanna,* warranted by as- " sured to be *American* property, to be proved, if required, in " this city, and not elsewhere." The vessel was taken on her voyage by a *British* squadron blockading *Cadiz,* sent to *Gibraltar,* and condemned, together with the cargo, for breach of the blockade of *Cadiz.*

The cause was tried at *Nisi Prius* before Judge SMITH last *July,* when a verdict was found for the plaintiffs for 20,267 dollars and 60 cents, subject to the opinion of this Court, on the three following points.

(*a*) 7 *D. & E.* 160.                    (*b*) 2 *Dall.* 137.

1. Whether the decree of the court of Vice Admiralty at Gibraltar, is or is not conclusive evidence of the facts set forth in it; and if conclusive, whether it discharges the underwriters.

2. Whether the conduct of Captain *Barker* in the Bay of *Cadiz*, in relation to the blockade, did or did not amount to a breach of the warranty in the policy.

3. Whether the Captain's conduct amounted to barratry. With liberty to move for a new trial, on the ground of the verdict being against law and evidence. Under this liberty a motion for a new trial has been made.

It will be necessary to state the material facts which were given in evidence. On the 8th *June* 1800 the brig sailed from *Charleston*, where the blockade of *Cadiz* was not then known; nor does it appear that the Captain knew of it until he received notice in the Bay of *Cadiz*, in the manner which I shall hereafter mention. On the morning of the 15th or 16th *July*, steering for *Cadiz*, and not many leagues distant from the shore, Captain *Barker* descried two large ships, one of which fired a gun at him; he stood on his course with all sails set. In about an hour he was overtaken by the *Hector*, one of the squadron forming the blockade of *Cadiz* under Admiral Sir *Richard Bickerton*; he then received notice not to enter *Cadiz*, which was blockaded, and was taken out of his vessel, and carried on board the *Hector*, with his papers and letters. The same day he was carried on board the Admiral's ship; the mate and four hands were taken out of the brig, and an officer and eight men put into her, with orders to detain her and stay with the fleet. The Captain was detained as a prisoner on board the brig; and thus things remained until the 27th *July*, when he was carried on board the Admiral's ship. The Admiral said to him, " We have thoughts of setting you at liberty: " in that case what course will you steer? or what port will you " go to?" The Captain answered, " In case I receive no new " order, or in case I receive no new instructions;" for in that respect the Captain's protest and his answer, when examined on interrogatories in the Court of Admiralty, differ: " I shall fol- " low my old ones." The Admiral replied, " that will be, I " suppose, for *Cadiz;*" to which the Captain answered, " cer- " tainly, unless I have new orders." Whereupon the Admiral said, " that is sufficient; I shall send you to *Gibraltar* for adju-

1808.

CALHOUN
v.
Ins. Co.
Penn.

" dication." Here again the examination of the Captain differs something from his protest: in the former it is thus expressed: " The Captain said that in case he got no new instructions, he " should proceed by his old ones, and go to *Cadiz;*" and the Admiral then told him, he must send him into *Gibraltar* for adjudication.

On the 26th *July* 1800, an indorsement, as follows, was made on some of Captain *Barker's* papers: " Warned not to " enter *Cadiz,* or *St. Lucar,* as they are blockaded; but has " permission to go to any other port." But it does not appear that the papers were ever returned to Captain *Barker* after they were taken from him on the 16th *July,* or that he ever saw them again, till they were exhibited by the captors in the Court of Admiralty at *Gibraltar.* *Christopher Bennet,* the mate of the brig, declared on his examination, that after they had been in possession of the *Hector* about ten days, the papers were offered to the master, and the command of his vessel, which he refused, because he thought the captors had unjustifiably detained him, and removed four men from the brig, on board the *Hector* and *Incendiary.*

On the 26th *August* 1800, the judge of the Court of Vice Admiralty at *Gibraltar* pronounced his decree of condemnation. After declaring the said brig to have been cleared out for *Cadiz,* a port actually blockaded, and that the master *persisted in his intention* of entering, after warning from the blockading force not to do so, in direct breach and violation of the blockade thereby notified, he pronounced the said brig and her cargo, and the master's private adventure, by *virtue thereof or otherwise* subject to confiscation, and condemned the same as *good* and *lawful prize.*

Upon the first question, whether the decree of the Court of Vice Admiralty is conclusive, I shall give an opinion founded on the special circumstances of this case, without entering into the general question of the conclusiveness of the sentences of foreign Courts of Admiralty. It is now well understood, that a warranty of *American* property, " to be proved if required in " the city of *Philadelphia* and not elsewhere," is to be so construed, that in case any dispute arises whether the property was *American,* and as such entitled to protection, or whether in the circumstances under which it stood at the time it was captured, it was to be considered as the property of an enemy,

such dispute is to be decided by proof in the city of *Philadel-phia.* A warranty of *American* property is a contract not only that it was *American* property at the time it was shipped, but that it should not lose that character by any act or omission of the insured or his agents, during the voyage. Now a question has arisen, whether the property has not lost its *American* character, by an attempt to break a blockade. It is a question springing out of the warranty. By what proof then is it to be decided? The answer is plain: by proof satisfactory to a court and jury in this city, and not elsewhere; not by the opinion of any foreign court, which it was the very object of this warranty to *exclude*. In this case, therefore, the decree of the Court of Vice Admiralty at *Gibraltar*, cannot be received as conclusive evidence that the property was not *American*.

2. But was the conduct of Captain *Barker* in the Bay of *Cadiz*, such as to throw off the *American* character, and forfeit the protection due to *American* property? Did he act in violation of the law of nations, or of the treaty between the *United States* and *Great Britain?* It is unnecessary to speak particularly of the Law of Nations, because the treaty is in exact conformity to it. One of the passages in the 18th article of the treaty, is as follows: " Whereas it frequently happens that " vessels sail for a port or place belonging to an enemy, with- " out knowing that the same is either besieged, blockaded, or " invested, it is agreed that every vessel so circumstanced, " may be turned away from such port or place, but she shall " not be detained, nor her cargo, if not contraband, be confis- " cated, unless after notice she shall *again attempt* to enter." The case supposed in the treaty is the very case we are deciding; the case of a vessel which sailed from *Charleston* without knowledge of the blockade of *Cadiz;* and how was she treated? She was not *turned away*, according to the treaty, but *detained*, in express violation of it. Did she attempt to enter again after notice? By no means. A conversation took place between Captain *Barker*, and the Commander of the *British* squadron, in which the former made use of an expression, which, to make the most of it, was but equivocal; and this is set up for an obstinate, determined, resolution to break the blockade. It may be questioned whether any *words* would be a breach of the treaty, since an attempt implies an *action*. But granting, for argument's sake, that under a liberal construc-

1808.

Calhoun
v.
Ins. Co.
Penn.

tion, a clear and positive declaration of an intention to enter a blockaded port, might amount to a breach of the treaty, I think the evidence in this case falls 'far short of the proof of such decided intention. I am far from being satisfied that it was Captain *Barker's* intention to attempt to enter *Cadiz*, unless he received permission to do so from Sir *Richard Bickerton*. When he said to the Captain, " we have some thoughts of " setting you at liberty, in that case, what course will you " steer?" the Captain might have supposed, that the Admiral meant liberty to go where he pleased; and understanding him so, the other words, " unless I receive *new orders*, or *new* " *instructions*," might intend orders or instructions from the *Admiral:* for the Captain could have no reason to suppose, that just at that moment he should receive orders or instructions from his *owners*. According to the evidence, the Admiral appears to have put this question with a view of taking advantage of the answer: and the conversation, taken altogether, is too slight and too obscure, to warrant the strong conclusion drawn from it, that the Captain was determined to break the blockade. I cannot say that his conduct amounted to a breach of the warranty in the policy.

3. The opinion which I have given, renders it unnecessary to say any thing on the third point.

Upon the whole of the case my opinion is that sufficient cause for a new trial has not been shewn, and that judgment be entered for the plaintiff.

Yeates J. I feel it unnecessary to decide in the present instance, how far the decree of a foreign Court of Admiralty is *conclusive*, on abstract principles, as between the insurer and insured. It is sufficient to observe that the plaintiff's counsel fully admit, that a sentence of condemnation in a course of proceedings *in rem* binds the property, and that where it has been condemned as *enemy's* property, or as *prize*, or when in the case of a warranty of neutrality the decree is founded on a *want of neutral papers*, or on *mixed premises of law and fact*, by proceedings according to the law of nations, it is conclusive evidence, not merely in suits between the identical parties in the foreign court, but as to collateral purposes, between other parties. The principle of these concessions has been recognised by this court in other cases.

**I** shall consider this cause more in the light of a special contract, than under general principles. The insurance was declared to be made on sugar, which was brought in the brig *John* from *Havanna* to *Charleston*, and not discharged there; warranted by the assured to be *American* property, *so to be proved*, if required, *in this city and not elsewhere.*

What is the true meaning of this clause? What was the understanding of the contracting parties, when they inserted it in the policy?

By the decision in *Geyer* v. *Aguilar* (7 *T. R.* 681.) it is settled, that the legal import of a warranty of *American* property extends beyond an engagement that it is *American;* and that it asserts the ship shall be navigated so that the insurer shall derive the full benefit of her neutrality. The risk is thereby lessened, and the premium is proportioned thereto. The insured are bound that the ship shall possess all the necessary documents required by the particular laws of the country, against whose hostility the insurance was made. It follows from hence, as a necessary consequence, that the master of the ship shall not only possess competent nautical skill, but shall so conduct himself as not to forfeit his neutral character, which would increase the risk of the underwriters.

We can well remember the period when such special agreements came to be inserted in our policies, and the cause of the insertion. Strong instances occurred of grossly partial and unjust condemnations in the Courts of Admiralty of the several belligerent powers; and the courts here having adopted the *English* doctrine that the sentences of such foreign courts were conclusive, as to the points *which they professed to decide*, it was judged necessary to introduce words similar to the present into the policies. The direct object of such clauses, *general in their nature*, was to guard against the unworthy conduct of foreign tribunals; and the construction thereof should be coextensive with the evils intended to be remedied thereby.

It is a settled rule, (*New York Cases in Error* 13.) that the insured, in order to comply with his warranty, must not only maintain the property to be neutral, but so conduct himself towards the belligerent parties, as not to forfeit his neutrality; he must pursue the conduct and preserve the character of a neutral. These were matters incumbent on the assured to prove, if required, " in this city, and not elsewhere," in case of loss by

any of the perils expressed in the policy. They are the neces-- sary predominant features of the *American character*, consi-- dered as a neutral nation. But if the decree of the Court of Vice Admiralty at *Gibraltar* was conclusive evidence of the facts set forth in it, and discharged the underwriters, it would be idle in the plaintiffs to offer any proof upon the subject; and the clause would be thereby rendered a dead letter, wholly nu-gatory and useless. I cannot bring my mind to accede to such a construction, and fully assent to the opinion expressed by Judge *Washington* in 1801 in *Calbraith* and *Gracie*, that under such a warranty the assured is at liberty, notwithstanding the sentence of a foreign tribunal, to vindicate the truth of his war-ranty with all its necessary incidents. If it has not this effect, the clause appears wholly useless, and can serve no purpose whatever.

Under the express agreement then of the contracting parties, I deem myself authorized to examine the evidence upon which a decree of condemnation has been pronounced. It is admitted by all the writers on the civil law, that no commerce or inter-course whatsoever is to be allowed to a neutral with a blockad-ed port; (*Vattel lib.* 3. *c.* 7. *s.* 117.) but *Grotius* adds this limi-tation, if surrender or peace be expected. (*Grot. de jure bel. et pac. lib.* 3. *c.* 1. *s.* 5.) This limitation however, has been con-demned as neither agreeable to reason nor to the conventional law of nations. (*Bynker. quæst. jur. pub. lib.* 1. *c.* 11. 2 *Brown's Civ. Law* 214.) The besieging or even blockading force, says *Vattel*, has a right to hinder any one from *entering*, and to treat as an enemy whoever *attempts to enter* the place, or carry any thing to the besieged without his leave; for he opposes the en-terprise, and may contribute to the miscarriage of it, and thus cause the party to fall into all the evils of an unsuccessful war. The ship attempting to break a blockade is liable to confisca-tion; its cargo may be so also, although not contraband, if the owners of that cargo were conusant of the blockade, before they sent or shipped it; although they might attempt to throw the blame on the carrier master, if such an attempt was proved to be founded in artifice: but if they were really ignorant of the fact, the master is not their agent to bind them by his contract, or his misconduct. (2 *Brown's Civ. Law* 318.) By the general law of nations therefore, with which the treaty between *Great Britain* and the *United States* accords, there must be an actual

attempt made to enter the blockaded port; and there must either be a formal notification of the existence of the blockade, or it must be apparent *de facto*. (1 *Rob.* 78. 128. 131. *Am. Ed.*) And though *Americans* are not exempted from the common effect of the notification of a blockade, existing in *Europe*, yet lying at so great a distance, the rule obtaining in *Europe* is reasonably said not to be rigidly applicable to them. (1 *Rob.* 282.)

Without citing civilians, it is perfectly clear that a treaty made between two nations abrogates and annuls the general law of nations as between the contracting parties, and ought to be held sacred and inviolable. The plaintiff's counsel rely much on the 18th article of the treaty of commerce concluded between the *United States* and *Great Britain* on the 19th *November* 1794. The defendants contend that this treaty is in confirmation of the law of nations, and introduces no new principle. Be it so. It will however be admitted, that it pointedly ascertains that no vessel sailing to the port of an enemy, unknowing of the blockade, shall be *detained*, nor her cargo, if not contraband, be confiscated, unless *after notice* she *shall again attempt to enter*.

In the case of the brig *Columbia* (1 *Rob.* 132.) Sir *Wm. Scott* declared himself clearly of opinion that sailing with the *intention* of evading a blockade, was beginning to execute that intention, and was an *overt act* constituting the offence, and from that moment the blockade was fraudulently invaded. He thought the ceremony of turning away the vessel unnecessary, when the merchant or his agents had acquired notice in fact, *even during the voyage*, of an existing blockade. The question came before the court for correction of errors in the state of *New York* (1 *Caines Cases in Error* 11.) in 1801, between *Voss* and *Graves* and the *United Insurance Company*, upon a policy underwritten on the same brig *Columbia*, wherein a contrary decision took place. The Court of Errors there expressed surprise that the moral law, which arraigns *intention*, should be adopted in the law of nations with a greater latitude than in our municipal system, for the *benefit of belligerents*, and to the *prejudice of neutrals*. " In intention, say the court, there is noth-" ing certain and permanent; it is controlled by every reflec-" tion; is changed, dropped, and renewed, by the occurrences of " every hour; by the constant vicissitudes to which the agent is " subject. The enterprise on a nearer view appals, the *locus*

1808.

CALHOUN
*v.*
Ins. Co.
Penn.

1808.

CALHOUN
v.
Ins. Co.
Penn.

"*pœnitentia* is embraced." "The rule, that sailing with a desti- "nation to a blockaded port, is a breach of blockade, is undefi- "nable in relation to distance, between the port of departure and "that of destination, and will produce great uncertainty and vex- "ation." The same principle was adopted in the Supreme Court of *New York* in *Liotard* against *Graves* in 1805. (3 *Caines* 236. 240.) And it cannot be denied, that the system of reasoning in these two last cases, is strong and almost irresistible, while we hold the treaty in view.

But without expressing any decided opinion, whether the *mere intention* of the neutral master shall constitute a breach of blockade *per se*, we may be allowed to inquire what evidence there is of such intention, in the present instance. We have the same evidence before us, on which sentence of condemnation was pronounced on the vessel and cargo, at *Gibraltar*. The vessel sailed from *Charleston* to *Cadiz*, on the voyage insured, on the 8th *June* 1800, duly documented, and both brig and cargo, were the property of *American* citizens. At the time of her sailing, it was not known at *Charleston*, that *Cadiz* was in a state of blockade; and Captain *Barker* has sworn, that neither he, nor his crew, knew of the blockade, until he was seized by the *British* ship of war, *Hector*, on the 16th *July* 1800, as he was steering for *Cadiz*, and within six hours sail of that port. He further declares in his affidavit, that if he had received orders from the *British* Admiral not to go to *Cadiz*, he would not have offered to proceed to that port. No counter proof was offered as to these facts: and if the Captain knew of the blockade antecedent to his seizure, it would have been folly in the extreme in him, to have directed his course to *Cadiz*, surrounded as he was by the squadron of Admiral *Bickerton*. When the seizure was made, the mate and four of the crew were removed on board the *Hector*, a prizemaster and eight men were put on board the brig, and Captain *Barker* was detained as a prisoner on board his own vessel until the 27th *July*, when he was sent on board the *Swiftsure*, the Admiral's ship. During this interval, let *Barker's* intentions be what they would, he could not, in his dearth of hands, overpowered as he was by the prizemaster and his party, have attempted to enter *Cadiz*, even if the *British* squadron was not in sight. The short conversation which he had with the Admiral on the 27th *July*, does not necessarily lead to the conclusion, that he

intended to violate the blockade. But this was deemed suffi-
cient by the Admiral, to send him into *Gibraltar* for adjudica-
tion; and on this, the sentence of condemnation must have been
founded; " because the master persisted in his intention to
" enter the blockaded port of *Cadiz*, after notification." The
effect which this interview has on my mind, is precisely the
same as that produced on the minds of the jurors, who found
the special verdict on the 12th *July* 1806, " that Captain
" *Barker's* intention was to go to *Cadiz*, unless he received
" new orders from Admiral *Bickerton* to the contrary; and if
" the Admiral had given new orders to Captain *Barker*, not to
" proceed to *Cadiz*, he would not have gone there, in breach
" of such orders." We have the authority of Sir *William Scott*
for asserting, that if there had been any thing *insidious* in the
manner of this interview, he should have thought it his duty to
protect the neutral from suffering loss or inconvenience, under
it. (1 *Rob.* 70.) And upon another occasion lately, he has de-
clared that hasty expressions, in a moment of surprise, are not to
be taken advantage of rigidly. (5 *Rob.* 258.) It is true that the in-
dorsements made on the brig's *American* register, sea letters,
and *Mediterranean* pass, in these words, " Warned not to enter
" *Cadiz* or *St. Lucar*, as they are blockaded, but has permis-
" sion to go to any other port. *Swiftsure off Cadiz*, 26th *July*
" 1800, *B. M. Hallowell*," serve at first sight to create suspi-
cions, as to the truth and correctness of Captain *Barker's*
account of the transaction, with respect to not being warned:
but when we consider that the papers of the brig were carried
on board the Admiral's ship, on her first seizure, and were
ever afterwards out of possession of the master, and that the
*British* officer, who lodged them with the Registrar of the
Vice Admiralty Court, swore that they were in the same
plight as when they were taken from the brig, our suspicions
on this score vanish and we are led to believe, that the master
had never been apprised of those indorsements.

The answers of *Christopher Bennet*, the mate, corroborate
the account of the Captain, and state in particular, that the
blockade of *Cadiz* was not known at *Charleston*, when the brig
left that harbour, and was wholly unknown to him until the
time of her arrest; and further, that they received no warning
not to enter *Cadiz*. His oath is, however, inexplicable in one
part by me. He says, without naming the day, that the papers

1808.

CALHOUN
*v.*
Ins. Co.
Penn.

1808.

CALHOUN
v.
Ins. Co.
Penn.

and command of the brig were offered to the Captain, but that he refused to take the same, on account of the siezure and detention of the brig. How could he have obtained a knowledge of this fact, unless at second hand? Immediately on the seizure he was put with four seamen on board the *Hector*, and the Captain continued a prisoner in his own vessel, under the direction of the prizemaster and eight men, until he was sent on board the Admiral's ship: of course they must have been separated, until they met each other again in *Gibraltar*.

On the one hand I cannot impute *barratry* to captain *Barker*, whereby the underwriters would be rendered chargeable. I can discover no *fraud* or *criminal conduct* in him, which are indispensably necessary according to the settled doctrine of this court in that offence. 2 *Dall.* 131. It will not be supposed that a tenacious adherence to the supposed interests of his owners, would merit reprehension. On the other hand, I cannot believe that his conduct in the bay of *Cadiz*, in relation to the blockade, so far as has appeared in evidence, amounted to a breach of the warranty in the policy.

The plaintiffs then, *bona fide American* citizens, had property on board to the amount of the sum insured. The brig, duly documented, *unoffendingly* sailed to the port insured. She was arrested within six or seven leagues of *Cadiz* by a boat from one of the *British* ships of war, *detained* for eleven days against the letter and spirit of the treaty, stripped of part of her seamen, and her master and crew were incapacitated by a superior force from proceeding to the destined port, or any other place. Judging on the evidence before us, I cannot discover any *intention in the master to violate the blockade, after notification;* and much less, in the language of the treaty, *after notice, any attempt again to enter the blockaded port.* I cannot therefore concur in the legality of the condemnation of the brig and cargo, believing as I now do, that neither the owners, shippers, master, or crew, have in ought offended against the treaty or the law of nations.

Within these few days we have been furnished by newspapers with the opinion of the Supreme Court of the *United States*, delivered by *Marshall* Chief Justice, in the case of *Fitzimmons* plaintiff in error, against the *Newport Insurance Company*, on a special verdict upon a policy on the brig *John* for the present voyage, but which is silent as to the place of proof

of the property insured being *American;* which made the case not nearly so strong as the present. The Court there declared that the facts disclosed did not amount to an attempt again to enter the port of *Cadiz;* and therefore did not amount under the treaty between *Great Britain* and the *United States*, to a breach of the blockade of *Cadiz.* The sentence of the Court of Vice Admiralty in *Gibraltar*, consequently, was not considered as falsifying the warranty that the brig was *American* property, or as disabling the assured from recovering against the underwriters in that action, and the testimony in the case shewed that the blockade was not broken.

Upon the whole, as this has been a loss by capture, within one of the perils expressed in the policy, I am of opinion that the motion for a new trial be overruled, and I concur that judgment be entered for the plaintiffs on the verdict.

SMITH J. I was of opinion on the trial that the plaintiff should recover, and have seen no cause since to think otherwise; at the same time I have been prevented by indisposition from reducing my reasons to writing. The assured was entitled to shew the truth of the case, under the special clause; and it does not appear that the conduct of the Captain amounted to a breach of blockade. Some *act* is necessary to constitute such a breach. I give no opinion on the question of barratry, which may come before us hereafter.

BRACKENRIDGE J. The points, in the order I shall take them, are 1st. Whether the conduct of the captain in the bay of *Cadiz*, in relation to the blockade, did or did not amount to a breach of the warranty in the policy.

The warranty in the policy is in substance, that the property insured was neutral; and the first question that arises will be, whether this shall be construed as warranting *against* a breach of a blockade. There would seem to be no doubt but that it shall be construed as a warranty that the property belongs to a neutral nation; that it is protected by documents that evince this neutrality; and that it shall remain the property of that nation, and be protected by documents evincing that neutrality, during the voyage insured. But whether breaking a blockade, which incurs a forfeiture, is within the warranty, is not self-evident. For at common law, the distinction is well known be-

VOL. I.                            2 R

*Margin note:* 1808. CALHOUN v. Ins. Co. Penn.

1808.

CALHOUN
v.
Ins. Co.
Penn.

tween what incurs the like forfeiture, though not the like act. As in the case of assisting a felon to escape, the forfeiture is the same with that of the principal felony. So capture is the penalty of a neutral breaking a blockade, which is the same as that of an enemy made a prize. But it is an offence of which a neutral may be guilty, and subjects to confiscation, not because it is in fact taking part in the war, but because the law of nations or particular treaties prohibit it in a neutral. *Grotius* (*l. 3. c. 1. s. 5.*) puts it on this ground: *ut is qui judici imminenti reum manifestum eximit: atque eo nomine licebit in eum statuere quod delicto convenit; quare intra eum modum etiam spoliari poterit.* It is founded on the idea, doubtless, that it is giving assistance, and is constructively a taking part. But it is distinguished from an act of direct hostility, and is not resented as a cause of war with the nation to whom the violator of the blockade belongs; nor does the nation resent the capture as a cause of war, the blockade having been broken. It is the affair of the owner of the property; and the forfeiture which he incurs is the penalty of the transgression; and the matter terminates in this. Nevertheless it seems to be spoken of by the writers of the law of nations as a departure from neutrality, and in the language of the writers on the law of insurance, it seems to be considered as included under a warranty of neutrality. " This warranty," says *Marshall*, (361.) " must not only be true at the time when the poli-
" cy is effected, but the insured should take care that he do not,
" by any act or omission on his part, forfeit his neutrality. Such
" forfeiture is a breach of the warranty. A ship may forfeit her
" neutrality by any act done or attempted against the law of
" nations." Here we find a forfeiture of neutrality, and a breach of the warranty of neutrality, spoken of as effected by the like acts against the rights of belligerents.

The next question that will then arise under this point will be, has there been a forfeiture of neutrality, or in other words, a breach of the warranty in the policy; that is, has there been a breach of the blockade by the conduct of the Captain in the bay of *Cadiz?*

Our treaty of 1795 with *England* takes the matter out of the law of nations, with regard to this, if in any respect different; and confines us to the words of the treaty with respect to what shall be a breach of blockade. "*Again attempt to enter*" supposes an attempt to enter before she had been turned away from such port or place, and before she could be liable to be detained.

In this case it does not appear that the vessel in question had been turned away before she was detained. The seizure was before turning away. The Captain was taken on board the captor, together with all his papers and letters, and detained on the 16th *July* from nine to eleven o'clock, and was then ordered on board the ship; during which, a prizemaster and some people were put on board his vessel to take charge of her. He was afterwards taken to the admiral, who ordered him to be detained, and that his mate and four of his crew should be taken out of the ship, and an officer, with eight men and a boy, put on board in lieu thereof, with direction to remain with the fleet. In this situation, as a prisoner in his own ship, he was detained until the 27th *July*, when he was again ordered on board the admiral's ship. The admiral then and there addressed him, saying, " We have some thoughts of setting you at liberty. In that case " what course will you steer? or what port will you proceed for? " In case I receive no new instructions, I shall follow my old " ones." The admiral then said, " I suppose that will be for " *Cadiz*." To which the Captain replied, " certainly, unless I " receive new orders." The captain by his protest declares that these words " new instructions, new orders," meant instructions or orders from the admiral. But it may be that they were intended and ought to be referred to owners; that it was as much as to say, in case of being set at liberty, I must steer for or proceed to *Cadiz*, for such are my instructions, such my orders; unless you could change my instructions or the orders of my owners, I must obey them. Taking this to be the meaning of the Captain's language, and supposing it not equivocal, but to contain an express declaration of intention to proceed to *Cadiz* in case of being set at liberty, yet it is but a declaration of intention to enter that port, and it could only be by being set at liberty, that he could be in the capacity to do the act, that is, to make the attempt to enter. The declaration manifested an intention; but it remains to this hour but evidence of an intention, not suffered to grow into an act. Intention to enter is short of an *attempt to enter*. The law is full of this discrimination between the intention and the act. Although a declaration of an intention to commit an offence, may be a ground of binding to good behaviour, yet it cannot be considered as constituting an offence. It would seem to me therefore by analogy to the principles of the common law, that the offence in this case was not complete, and that there was not an absolute breach of the blockade. This

is taking up the matter on the principle of strict construction; but such is the principle of all laws which establish an offence, that they be construed strictly. It is a principle of reason and humanity, and not peculiar to our own common law, but that of all nations. Where a forfeiture is claimed, it behoves the claimant to shew the forfeiture completely made out of which he would take the advantage. It might have been but matter of form in this case to have restored the Captain his mate, and four mariners and boy to the ship, setting them at liberty; but it was necessary to be done in order to constitute a free agency, and to put the captured in a capacity to put about the ship, and *again attempt to enter*. This might have been form, but it was necessary to go through it. The admiral would seem to have been over hasty in seizing the vessel in the first instance, and in the last, deficient in that *astutia* which a spoiler under the forms of law ought to have, or which the enforcer of the penal code ought to exercise, in order to avail himself of the *summum jus*.

This construction of the words " attempt to enter," is supported by that of the Supreme Court of the *United States*, in the case of *Fitzimmons* against the *Newport* Insurance Company according to a report of it which I have seen published; and it is some evidence of the justness of my construction, that I had not any knowledge of that report when I prepared the foregoing on this point. Different minds without communication thinking the same thing, furnishes a proof in favour of the deduction.

2. A second point in this case, to which the verdict is subject, is, whether the decree of the Court of Vice Admiralty at *Gibraltar*, is or is not conclusive evidence of the facts set forth in it; and if conclusive, whether it discharges the underwriters.

The judgment of a foreign municipal court is not conclusive in *England*. An acquittal in a foreign court is a bar in a criminal prosecution; *(Bul. N. P.* 245.) but a judgment in a civil action is examinable. The issue of *nul tiel* record goes to the jury, because there is no way of bringing the record into court; and the seal of a foreign court must be proved by testimony. The judgment is examinable, because when the court is called upon to enforce the judgment, it claims a right to examine the ground of it. *Doug.* 1. 2 *H. Black.* 410. *Peak Ev.* 70. The *sic volo* would be a better reason; for why shall the *lex loci* govern the contract, and not the forum of the place determine the controversy which arises out of it?

But if the judgment of a foreign municipal court, even between the same parties, where there has been an actual *contestatio litis*, shall not be held conclusive, why shall the judgment of a foreign maritime court form an exception, and conclude? It is true, the domestic court in a case of insurance is not called upon to enforce the judgment of the foreign court: but it is called upon to enforce that which depends upon it, and is drawn from it. We must therefore look to some other source for the reason of the exception, and to some other source than reasons drawn from the effect of judgments of domestic courts of a peculiar jurisdiction. For reasoning from that source fails, when we consider that the community has the framing her own jurisprudence, and the constituting her own courts, with powers and limitations as to all matters within herself; and she has it in her power to consider the judgment of one court or another, conclusive or examinable, as she pleases. It is true we may argue, that as in our domestic courts of peculiar jurisdiction we hold a judgment conclusive, so we ought to hold the judgment of a foreign court of peculiar jurisdiction, conclusive. But it will not follow: for the same reasons of policy which may lead to protect our domestic judgments, and give them a conclusive effect, may not hold in the case of a judgment of a foreign court.

Different results on the same question in the foreign prize court and collaterally in the domestic court, is an argument from inconvenience. But the same thing is suffered in other cases. It must not only be on the same question, but between the same parties, that a verdict or judgment in the common law court at home, can be even given in evidence, much less be conclusive; therefore there may be different results on the same question, in the same court, as it affects strangers, parties, or privies. All the world are parties to the sentences of these courts of peculiar jurisdiction, say judges and some commentators. But that in reality is not the case; nor is it the ground of the policy. "The ground is the peculiar jurisdiction of the "courts, independently of other considerations; and not in re- "spect to any distinction of persons, stranger, party, or privy." *Harg. Law Tracts* 457. But I have nothing to do with this; I am only shewing that the inconsistency of contrary results on the same question, even in the same court, is an inconvenience which the law, for the sake of justice, cannot but endure.

1808.

CALHOUN
v.
Ins. Co.
Penn.

If we consider the judgment of a foreign court as conclusive, it must be because the community under which that court is constituted, demands it of us; or because our own convenience renders it expedient. If the community demands it of us, it must be in virtue of a treaty, or under some law of nations. Treaty in the present case is out of the question: for there is no such provision in any treaty we have with foreign powers; nor have I ever met with, or heard of such a provision in any treaty. Is it a law of nations? If so, where is it laid down? With what writer found? The *French* disclaim it. " As between " the insurer and insured they enter into the justice of the con- " demnation of a prize court." (1 *Emerig*. 458.) The *English* nation alone gives it countenance. The ideas of one nation cannot make a law of nations. But it may be said, the reason of it, the necessary policy, makes it a law. But what reason? what policy? How are nations interested in carrying the judgment of a prize court farther than to protect the thing sold? On the score of convenience to ourselves, provided it breaks no relation with a foreign nation, what is it to the home government how the judgment of a foreign court is considered, as to its effect in a matter of *meum* and *tuum* between citizens of the home government, unless to let in an examination of the prize court sentence, in order that the justice or injustice of it may appear, and be known to the public?

But it is alleged that the *English* common law courts have adopted it as a principle to a farther extent; and thence it has become common law, that the sentence of a foreign prize court shall conclude, not only in *rem*, but in a matter where the effect of the judgment shall come collaterally and incidentally in question; that the judgment of the foreign prize court being placed on the same footing with that of the domestic prize court, and the common law being our law, we are pinned down, and cannot bring in question the justice of the judgment of the foreign prize court. If this is so, I do not see that it can be done, even by consent. A wager would not be sustained in the *English* courts, which would bring in question the justice of the judgment of a court of a peculiar jurisdiction, nor would it be suffered in any action where the judgment came collaterally and incidentally in question. If so, and the judgment of a foreign prize court is put on the same footing with that of the domestic prize court, and it is adopted as a principle of the common law, that the judgment of a foreign court is conclu-

1808.

CALHOUN
v.
Ins. Co.
Penn.

sive to all intents and purposes whatsoever, and its judgments are protected with such sacredness and respect, as not to be touched as to their effect, even collaterally and incidentally, no understanding of the parties, no stipulation, can enable the court to go into a traverse of the grounds of a foreign judgment, so as to examine the justice of it. No help therefore can be derived from the stipulation in this case, " warranted *American* " property, and to be proved here." But I deny that it is a principle of the common law, that the effect of the judgment shall be carried farther than to protect the thing sold. What evidence have we of it? What case before the date of our charter, or even before our revolution, where a decision has taken place precisely on this point, with a reference to common law writers, or to year books, or to books of entries, or reports? For I would require something of this nature before the decision of a Judge, even an hundred years back, or two hundred, would pass with me as conclusive, unless the reason of the case was with him, and I could clearly see that even if the thing was not so, it ought to be so. In the case of *Hughes* and *Cornelius*, which is the leading case on this point, there is no case cited, no authority from whence it might be seen what was the extent of the doctrine. It is put on the foot of reason and general policy. Now if reason and general policy carried it farther than to protect the thing sold, how can the courts vary the policy when carried farther, and let in an examination by consent? The reason given in *Hughes* and *Cornelius* is, that if we do not pay respect to the sentence of the court of a foreign nation, the foreign nation will not respect the sentence of our prize court. The extent of the decision must be tested by the reason of it: and if the decision extends to the case of the insurer and insured, the reason must. The argument will then be, that the courts of a foreign nation will not respect a sentence of our courts, unless we consider the adjudication as conclusive on the contract of insurance. In that case we must not put it in the power of parties, by their stipulations, to involve us in this dilemma. No: the stipulation would be contrary to good policy, and could not be endured; for though it might shew the understanding of the parties, yet it would be an understanding which could not be carried into effect. Who ever doubted the understanding of the parties in the contract of insurance, could it have been left to the juries at all times on that point? That of itself would prove that the examination of a sentence broke no

relation with foreign powers, and must be a matter of indiffer-
ence to them, provided it is not suffered to affect the sale of the
property which has been transferred under a sentence of their
courts. The point in *Hughes* and *Cornelius* respected only the
property which had passed under a sale of the prize court, and
nothing farther was determined in that case; but the generality
of the reason given, has been assigned in subsequent cases as a
ground to carry it farther, and it has been always argued as at
this day, that because a court of peculiar jurisdiction, the sen-
tence of a foreign prize court should be put on the same footing
with a judgment, decree, certificate, or sentence, of our own
courts of that description: not distinguishing between the neces-
sity, convenience, or policy, in the one case, which may not exist
in the other. I have traced the history of this conclusiveness of
the sentence of a foreign prize court from the first dicta which
seemed to look that way, to the latest decisions; and have
seen from what misconception and misapplication the doctrine
has arrived at its present growth, and how much the *English*
courts are embarrassed with it; which embarrassment lies not
in our way, because the decisions which fetter them, beginning
with *Bernardi* and *Motteux*, have been since our revolutionary
period. But even if they were before, and fell upon us as they
do upon them, I would think it competent to look into the
grounds on which the first decisions went, and restrain them to
just limits. If from misconception or misapplication a doctrine
gets a footing, there can be nothing in the way of setting it
right, but that of property having passed under it, or the incon-
venience of unsettling adjudications. It not being real estate
that is here to be affected, but matter of personal property re-
coverable or not recoverable in a personal action, it can only be
the last consideration that can be in the way of overruling an
erroneous principle in this case, even supposing that it had got
a footing in the jurisprudence of this country.

The adjudications of foreign prize courts are supposed to be
founded on the law of nations, and to be conducted with equity.
But this presumption, even in the opinion of the *English* courts
themselves, with regard to the *French* courts, has totally failed;
and they have proved this by granting salvage on the recapture
of neutral property from the *French*, considering capture and
condemnation as the same thing. (2 *Rob.* 246.)

These *United States* say of the *English* captures, *de te fabula:*
this being the case, what reasons of policy can lead to counte-

nancing the adjudications of either, or to respect the sentence further than as falling on the thing captured and sold? On the contrary, good policy would seem to require that an examination of the grounds of the sentence should be let in collaterally or incidentally, as it would afford an occasion to ascertain *the robberies that take place under the forms of justice.*

I see therefore nothing on the ground of national interest or policy, to exclude the parties to a contract of insurance, from a re-examination of the cause of condemnation, according to the understanding of the contract, implied in the undertaking, or expressed in the stipulation. But it is made a point:

3. Whether the condemnation was not owing to the gross misconduct of the Captain: and whether it was not such as to discharge the underwriters.

This depends upon the expression of the Captain in answer to the admiral, who had said " We have thoughts of setting " you at liberty: in that case, what will you do?" It is impossible to say now, how the thoughts of the admiral might have settled down, and into what resolved themselves; whether to set at liberty, or retain the capture. It is certain that if the admiral had really any thoughts of setting at liberty, this declaration of the captured was calculated to prevent it. It is very probable it did prevent a restitution. But as the capture was complete before, a prizemaster on board, and as there was a detaining contrary to treaty, and a right of abandonment arisen, the question comes to this,—whether the declaration of the Captain made subsequently, and calculated to prevent restitution, would relieve the underwriters from the loss, before complete. It would seem to me that it would be too much to say, that the declaration of the Captain, unequivocal as we are willing to suppose it, did prevent restitution; and unless I could say that it did, I do not see that I can avoid deciding for the insured in this case.

But let it be taken that the meaning of the Captain was a *plain declaration,* that unless he got new *instructions, new orders,* from his owners, a thing impossible, he would as soon as at liberty steer for *Cadiz;* and that this prevented the restitution of the capture, and did in fact amount to the same thing as if in the first instance he had attempted to enter after being turned away, and by this means had broken the blockade. The final question in this case will arise, was it barratry in the Captain? For though the warranty on the part of the assured, of the pro-

1808.

CALHOUN
*v.*
Ins. Co.
Penn.

1808.

CALHOUN
v.
Ins. Co.
Penn.

perty being neutral, may be considered as warranting against all that divests the neutral character, and so against the breach of a blockade; yet it must consist with the warranty on the part of the insurer, viz. against the barratry of the Captain; and if the neutral character is divested by an act of barratry in him, the insurers are liable. It will then be a question whether the breach of the blockade in this case will be barratry, as alleged, by the declaration of the Captain to the admiral of his intention to break it; supposing it under all circumstances to be a breach of the blockade. It is a criminal act, a violation of the treaty. It is not stated to be with the knowledge or *consent* of the insured. But the Captain may have thought it for their benefit, to run the risk of attempting to enter; and it is not a part of the point submitted, that he had any interest in it. The case then is this: A *crime*, the cause of the loss, committed without the consent of the insured, without interest to the Captain, and which he may have ill-judgingly thought, or, to put the case stronger, did think, *for the benefit of the owners*.

" It appeared to m ," says Lord *Mansfield*, " that the nature " of barratry had not been judicially considered, or defined in " *England* with accuracy. It is not easy to collect from a gen- " eral verdict, or from notes taken at *Nisi Prius*, what was the " true ground of decision."

After considering the common law cases of *Knight* and *Cambridge*, *Stamma* and *Brown*, and *Elton* and *Brogden*, he observes, " that these cases do not afford any precise definition of " what barratry is; therefore I wished the cause to stand over " to be argued by one counsel on a side; I have in the mean time " considered of it, and consulted with men conversant in mer- " cantile affairs, and I am now *very clear*." (*Cowp*. 153.) He defines it to mean cheat, fraud, cozening, or trick. The *fraus, dolus aut deceptio*, had been given as the definition before; and I cannot find any thing more explicit here. So that in fact however clear to him, he has left it as dark to me as he found it. But if he means that, in application to the case before him, he was clear, I agree that he might be so.

*Parke* (94.) defines it " any act of the master or of the " mariners, which is of a criminal nature, or which is grossly " negligent, tending to their own benefit, to the prejudice " of the owners of the ship, without their consent or privi- " ty." If the words " tending to their own benefit" were

struck out of this definition, I should be willing to adopt it. For though some indulgence of self-interest may occasion this *crassa negligentia*, or lead to this conduct, and usually appears in the case, yet without this ingredient, I take it there may be barratry. At least it is not necessary for the insured to shew it. The law will infer it from the *criminal act*, or the *gross negligence*.

In *Knight* and *Cambridge*, says Lord *Mansfield* (*Cowp.* 183.) " the neglect of the Captain in not doing his duty was adjudg- " ed barratry; for it was his duty to pay the port duties, before " the ship went out of port, and 'he being guilty of *neglect* " in not discharging them, it was adjudged to amount to " barratry."

" With us," says *Marshall* (445.) " no fault of the master or " mariners amounts to barratry, unless it proceeds from an in- " tention to defraud the owners of the ship." In his note at this place he cites an authority: *non omnis navarci culpa est barrataria; sed solum tunc ea dicitur quando comittitur cum præexistenti ejus machinatione, et dolo præordinato ad casum.* There is nothing here of intention to defraud. It is only of intention to do the act; that is, it must be *wilful.* The first case which he gives to illustrate his definition (7 *T. R.* 505.) was that of a deviation; but fraud was negatived by the verdict of the jury; and therefore barratry could not be inferred. But in *Moss* and *Byrom* (6 *T. R.* 379.) Lord *Kenyon,* speaking of the devi- ation by the Captain, lays it down that " it was contrary " to his duty, and to the prejudice of his owners, because they " stipulated by the charter-party that the *ship* should sail di- " rectly to *Liverpool,* and therefore they were liable to the " freighters for any damage that might happen in consequence " of that deviation." In this case the Captain had no interest for himself; but what is more, was acting, as he thought, for the benefit of the owners; but by LAWRENCE J. " though the " Captain might conceive that what he did was for the benefit " of his owners, yet if he acted contrary to his duty to them, it " was barratry."

We are furnished by the counsel for the plaintiff with a case in *Relf's Gazette* of the 6th *March* 1807 containing a report of a decision in the Court of King's Bench of the 27th *November* 1806, *Earl* v. *Rowcroft,* which recognises this doctrine;

1808.

Calhoun
v.
Ins. Co.
Penn.

and though but a newspaper report, yet I incline to think it genuine, and extract it here as it stands in the *Gazette*.\* Applying the doctrine of this case to that before us, it would seem to be immaterial what the Captain thought in his declaration, or whether he thought at all. It was wilful, and intended benefit to himself or owner: it was mischievous; and taking it to be the cause of the loss, it was barratry. So that *quacunque via* the insurers are liable.

New trial refused, and
Judgment for Plaintiff.

\* Since reported in 8 *East* 126.